UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF VIRGINIA
Richmond Division

In re: Shaheen Aloam Ferris, II,                     Case No. 08-36224-DOT
       Debtor                                                        Chapter 7


W. Davey Crockett,
       Plaintiff,

v.                                                                   Adv. Pro. No. 09-03178-DOT

Shaheem Aloam Ferris, II,
       Defendant


### MEMORANDUM OPINION

Plaintiff W. Davey Crockett, filed the complaint in this adversary proceeding against debtor Shaheen Aloam Ferris II seeking to deny debtor's chapter 7 discharge pursuant to 11 U.S.C. § 727(a)(2) and (a)(3) and to have amounts due to plaintiff excepted from discharge pursuant to 11 U.S.C. § 523(a)(2) and (a)(4). Following trial the parties submitted proposed findings of fact and conclusions of law.

For reasons stated in this memorandum opinion the court finds that (1) the provisions of § 727(a)(2) and (a)(3) do not apply to bar Ferris's discharge in bankruptcy, and (2) the debt owed to plaintiff by debtor will be excepted from discharge pursuant to 11 U.S.C. § 523(a)(2)(A).

FINDINGS OF FACT

Plaintiff Crockett is a practicing dentist who also provides financing for used motor vehicle dealerships. Since the mid-1980's, Crockett has provided financing for five different dealerships. Beginning in 1998, he provided dealer financing for debtor Ferris.

1

During all relevant time periods, debtor Ferris was a used vehicle dealer. In 1998, he was a principal in a used vehicle dealership known as ValuCars, LLC. On January 12, 1998, Ferris and Crockett, in their individual capacities, entered into a contract under which Crockett would finance Ferris's acquisition of vehicles. The arrangement contemplated that Ferris would acquire a vehicle and then give Crockett the certificate of title, along with "all other indicia of ownership necessary for Crockett to have title to secured vehicle put in his name." Crockett would then retain the title and write a check for the vehicle purchase price paid by Ferris. Crockett's checks were written to the registered dealer ValuCars as was required by the Virginia Department of Motor Vehicles (DMV). Ferris's repayments to Crockett were written on checks from ValuCars.

The parties' contract provided that vehicles financed by Crockett would be sold by Ferris within thirty days and required Ferris to pay interest at the rate of two percent per month. The final paragraph of the agreement stated that "Ferris will keep each financed vehicle free from an adverse lien, security interest, or encumbrance and will not waste or destroy the vehicle." Crockett believed that his interests in the financing transactions were secure because he believed Ferris could not transfer vehicles to another owner without having possession of the titles.

The initial total of the amounts advanced by Crockett to Ferris was $50,000.00 to $60,000.00. In the beginning, loan transactions functioned as contemplated in the parties' contract, with vehicles purchased by Ferris and funds advanced by Crockett. Ferris delivered required documents to Crockett, and when vehicles were sold, he repaid the outstanding debt. Of note, during the course of his dealings with Ferris, Crockett did not

2

record his liens on the financed vehicles with the DMV but rather retained the paper title to each vehicle.

In 2001, Ferris left ValuCars and formed Short Pump Auto Sales, LLC. While at ValuCars, Ferris had been selling vehicles to other dealers and at auctions. However, at Short Pump Auto Sales Ferris was selling to individual purchasers. Because sales to individuals took longer, some change in the practice between Crockett and Ferris was necessary. The thirty day period for Ferris to repay loans after acquisition of a vehicle needed to be longer. Consequently, Crockett required additional protection from Short Pump Auto Sales because the values of vehicles declined as they sat on the lot awaiting sale. The parties decided that in addition to interest provided by the contract, Ferris would pay Crockett monthly "buydown" amounts. Crockett assessed these amounts for which he submitted periodic bills. A further change in the course of dealings between the parties was Crockett's assessment of processing fees when loans were initiated.

Beginning in 2002, in connection with the assessment of buydowns and Crockett's frequent reduction of a loan's monthly interest rate, Crockett maintained what the parties referred to as "tally sheets." The sheets contained all the relevant information to a deal and also showed the buydown and interest payments assessed and received by Crockett. Ferris also maintained records that showed information relevant to a deal and a final column headed "Sold and still on Floor Plan."

The business relationship between the two parties was uneventful until November 2007, when Ferris came to Crockett and advised him that he was unable to continue making his payments and that he was out of trust on several vehicles. Prior to that time, Crockett had made several inquiries of Ferris as to the status of his business, and Ferris

had never indicated that he was having trouble making his payments or that he was out of trust on any vehicle. After the November 2007 revelation, Crockett made no further loans to Ferris, although Ferris continued to make repayments.

Despite Ferris's revelation of sales out of trust, Crockett thought his interests were reasonably protected because he held the original titles on the vehicles. However, Crockett subsequently discovered that of the approximately eighty vehicles to which he held titles, only four were at Ferris's Short Pump Auto Sales lot. This discovery, coupled with Crockett's inquiries to the Virginia Motor Vehicle Dealer Board and the Virginia DMV, contributed to Crockett learning that Ferris had been engaged in selling vehicles without advising Crockett and continuing to make the periodic interest and buydown payments on vehicles that he had sold.

Ferris was able to sell the vehicles without advising Crockett, repaying the loans and reacquiring the titles from Crockett because in July 2004, Ferris had been approved as an online dealer with DMV. This allowed him or his title clerk to apply online to have the vehicles retitled in the names of purchasers. Ferris did this for multiple vehicles he had sold but for which Crockett held the paper titles. A part of the online titling process required Ferris to certify that he held the original titles, a certification that he made despite knowing that Crockett held the titles. During the time periods in which Ferris had engaged in this behavior, DMV did not have a system in place to monitor whether the actual required documents were in fact maintained or submitted by an online registrant.

At the time Ferris filed this chapter 7 case, he had caused Short Pump Auto Sales to sell seventy-three vehicles for which no repayment was made to Crockett and for which Crockett held the original certificates of title. For each of those seventy-three

4

vehicles, Ferris had applied for retitling online and did not submit the required original title documentation to the DMV.

The principal outstanding debt for the seventy-three vehicles is stipulated by the parties to be $495,825.00. The average period of time for which each of those seventy-three vehicles was financed was approximately twenty months.

Ferris filed his chapter 7 bankruptcy case on December 5, 2008. Debts listed in his schedules are a debt secured by real property located in Manakin-Sabot, Virginia. Unsecured debt listed includes only Ferris's liability to Crockett along with a credit card debt in the amount of $7,900.00.

On December 5, 2008, Short Pump Auto Sales, LLC, also filed a chapter 7 case. The corporate resolution authorizing the filing was signed by Ferris as managing member.

Additional findings of fact are contained in the court's conclusions of law.

## CONCLUSIONS OF LAW

Crockett has objected both to Ferris's discharge and to the dischargeability of the debt owed Crockett by Ferris. The court will first consider the issue of discharge and then address dischargeability.

**I.   Discharge**

Crockett relies on 11 U.S.C. § 727(a)(2) and (a)(3). Section 727 of the Bankruptcy Code instructs the court to grant a chapter 7 debtor a discharge unless a debtor falls into one of twelve enumerated categories. Subsection (a)(2) provides that a debtor shall not be granted a discharge if:

> (2) The debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property…, has transferred, removed,

5

> destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed -
> (A) property of the debtor, within one year before the date of the filing of the petition; or
> (B) property of the estate, after the date of the filing of the petition;…

In the year prior to the filing of the petition, it is uncontested that Ferris caused vehicles to be transferred from Short Pump Auto Sales to individual purchasers without advising Crockett of the sale and without remitting the proceeds to him. However, those vehicles were not property of Ferris or his bankruptcy estate but rather were property of Short Pump Auto Sales. Thus, the objection to discharge is not properly brought against Ferris based upon § 727(a)(2).

Section 727(a)(3) provides that a debtor may be denied a discharge if:

> The debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve the recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case.

As noted above, however, the focus of the objection in this adversary proceeding is essentially against Short Pump Auto Sales and not against Ferris. However, even if the court considered the Short Pump Auto Sales recordkeeping to be an issue in this adversary proceeding, the records kept by that business reflect that entity's practices sufficiently, even to the point of containing a column that noted when a vehicle had been sold but was still being financed through Crockett. These records were available to Crockett at any time. Any gap in recordkeeping was explained by evidence of a break-in to the Short Pump Auto Sales offices. Thus, section 727(a)(3) does not provide grounds for the court to deny Ferris's discharge.

## II.    Dischargeability

Crockett bases his objection to the dischargeability of the debt owed him by Ferris upon § 523(a)(2) and (a)(4) of the Bankruptcy Code. As the objecting party, Crockett bears the burden of proving that the debt should be excepted from discharge under 11 U.S.C. § 523(a) by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 291 (1991).[1]

**Section 523(a)(2)**. Section 523(a)(2) provides that a debtor may not receive a discharge of any debt:

> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extend obtained by –
> (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's…financial condition.

Section 523(a)(2)(B) appears not to be at issue in this case, as it deals with false financial information provided in writing to a creditor. The complaint is not specific as to which subsection upon which Crockett relies, but all of the arguments presented by Crockett sound under § 523(a)(2)(A). Thus, the court finds no basis for a finding of nondischargeability under § 523(a)(2)(B).

To prevail under § 523(a)(2)(A), Crockett must prove:

1. that the debtor made a representation;
2. that at the time the representation was made, the debtor knew the representation was false;
3. that the debtor made the false representation with the intention of deceiving the creditor;
4. that the creditor relied on such representation; and
5. that the creditor sustained the alleged loss and damage as the proximate result of the false representation.

---

[1] In his answer to the complaint, Ferris raised various affirmative defenses, including statutes of limitation, waiver and estoppel. At trial and in the parties' proposed findings of fact and conclusions of law, neither party addressed these issues and the court therefore assumes that Ferris has abandoned those defenses.

*Elrod v. Bowden (In re Bowden)*, 326 B.R. 62, 82 (Bankr. E.D. Va. 2005). The Fourth Circuit has held that under § 523(a)(2)(A), a plaintiff need only meet the minimal standard of justifiable reliance on the debtor's representations rather than the higher standard of reasonable reliance. *Foley & Lardner v. Biondo (In re Biondo)*, 180 F.3d 126, 135 (4th Cir. 1999); *see also Field v. Mans*, 516 U.S. at 59.

By presenting Crockett with the certificates of title when each loan was consummated, Ferris represented to Crockett that he was in possession of the vehicles and would not transfer them without first obtaining the titles from Crockett and paying the amounts owed to Crockett. This satisfies the "representation" element of § 523(a)(2)(A).

Turning to Ferris's knowledge that his representations to Crockett were false (the second element of § 523(a)(2)(A)), the court finds that once Ferris made the first false representation to the Virginia DMV, obtained a title and transferred a vehicle in which Crockett had a security interest, Ferris knew that that Crockett's holding the titles was no longer protection of Crockett's interest. Ferris also knew that he might not repay the loan made by Crockett when the vehicle was eventually sold, and in fact he did not do so with respect to seventy-two subsequently retitled and sold vehicles. The fraudulent DMV retitling and subsequent sales demonstrate that Ferris knew that his representation to Crockett that Ferris would not and could not transfer a vehicle without first paying off Crockett was false. A necessary corollary to that misrepresentation was Ferris's further

misrepresentation, express and implied, that when the vehicles were sold, Crockett would be paid.[2]

As to the "intent to deceive" element of § 523(a)(2)(A), the court finds that Ferris made the representations to Crockett for the purpose of inducing Crockett to lend the funds to finance the Short Pump Auto Sales inventory. Crockett argues reasonably that he would not have advanced funds to Ferris had he known that Ferris was selling vehicles out of trust. Ferris counters by arguing that over the years, the business practices between the parties had changed and that Crockett had tacitly acquiesced to these changes. Among those changes, he avers, was the consent of Crockett to the sales of vehicles out of trust, a change in practice that Crockett vehemently denies. However, that argument is illogical, and the evidence does not support it. If sales out of trust had in fact been an accepted practice between the parties, there would have been no reason for Ferris to continue to provide Crockett with certificates of title at all. Further, there would have been no reason for Ferris to make false representations to the Virginia DMV as to his possession of the certificates of title.

Ferris argues that Crockett has failed to satisfy § 523(a)(2)(A)'s reasonable reliance requirement. He asserts that Crockett did not reasonably rely upon representations made by Ferris. Ferris argues that the facts point irrefutably to Crockett's willing participation in Ferris's sale of vehicles without paying off the loan from Crockett and asserts that it should have been "readily apparent" that Ferris did not have possession

---

[2] Ferris testified that he always had an intent to repay Crockett. However, in this case, the issue is not Ferris's intent to repay Crockett, but rather Ferris's intent to deprive Crockett of his security interest in the vehicles without first paying Crockett the amount of the loans secured by the vehicles.

9

of all of the vehicles for which Crockett held titles.[3] Ferris makes much over the fact that the car lot upon which Short Pump Auto Sales was located would hold only a limited number of vehicles. He points out that the number of vehicles financed at a time substantially exceeded the space for them on the lot and that Crockett had to have been aware of that fact. However, even if Crockett had admitted to being aware of the fact that not all of the cars being financed could have been located on the lot, there are other possible reasons for the discrepancy than sales out of trust by Ferris. Some of the cars could have been held elsewhere, or some could have been undergoing repair.

Ferris also argues that the records he kept showed without question that some vehicles were sold prior to payment in full to Crockett. He asserts that Crockett would have discovered this information had he come to Short Pump Auto Sales and inspected the books and records. However, this argument is somewhat disingenuous. It is not a defense to wrongdoing to assert that the misconduct could have been discovered, and there is nothing to support Ferris's assertion that Crockett should have done so. In short, the court is unwilling to place upon Crockett the burden for ascertaining the status and location of the financed inventory of Short Pump Auto Sales. While an in-depth investigation into all of the facts and circumstances surrounding Ferris's and the dealership's possession of the vehicles might have been a more prudent business practice and would perhaps have reduced Crockett's financial losses, Crockett was under no obligation to do so.

---

[3] Ferris cites *Field v. Mans*, 516 U.S. 59 (1995) for the proposition that "the inquiry will…focus on whether the falsity of the representation was or should have been readily apparent to the individual to whom it was made."

The bottom line is that Ferris's falsification of the DMV records was his undoing. It is impossible to explain such actions without concluding that he was acting to keep Crockett in the dark as to the status of the vehicles securing Crockett's loans to Ferris. He needed Crockett to believe that he was in a secured status in order to induce him to make further inventory loans, and he took action to ensure that Crockett so believed.

Damages to Crockett may be attributed to the amounts due from the loans secured by the seventy-three vehicles that were financed by Crockett and for which Ferris fraudulently obtained titles from the DMV. That amount was stipulated by the parties as $495,825.00. The court finds this amount, lent by Crockett for seventy-three vehicles for which Ferris induced him to make loans and as to which he falsely represented that Crockett would be in a secured position, to be nondischargeable pursuant to § 523(a)(2)(A) of the Bankruptcy Code.

**Section 523(a)(4).** Section 523(a)(4) prohibits discharge of any debt incurred for "fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny…."

<u>Fraud or defalcation in a fiduciary capacity</u>. Under § 523(a)(4), a debt may be excepted from discharge if the debtor commits fraud while acting in a fiduciary capacity. "In the bankruptcy context, the term 'fiduciary' is narrowly construed, and 'fiduciary capacity' is limited to actions by individuals under express or technical trusts that are in existence before the defalcation upon which the claim is based." *Global Express Money Orders, Inc. v. Davis (In re Davis)*, 262 B.R. 673, 682 (Bankr. E.D. Va. 2001). The Court of Appeals for the Fourth Circuit has not issued a published decision on the "proper contours of the term 'fiduciary' as used in § 523(a)(4)." *See Kubota Tractor Corp. v. Strack (In re Strack)*, 524 F.3d 493, 497, n.6 (4th Cir. 2008). The court of appeals has

11

apparently not rendered a decision on the applicability of the statute to corporate officers or directors.

In *KMK Factoring, L.L.C. v. McKnew (In re McKnew)*, 270 B.R. 593, 625 (Bankr. E.D. Va. 2001), Judge St. John embarked on a lengthy bankruptcy case law analysis on whether a corporate officer or director stands in a fiduciary capacity to their corporation for purposes of § 523(a)(4). He found that courts in some jurisdictions do impose a fiduciary duty on corporate officers who, for example, receive compensation improperly. *Id*. at 625-28. Judge St. John found, however, that the bankruptcy courts in the Eastern District of Virginia "are reticent to impose liability under § 523(a)(4) except in those instances where the Courts found an express trust in existence," and in *McKnew*, he held that a co-manager of a Virginia limited liability company who took unauthorized compensation was not a fiduciary for purposes of § 523(a)(4). *McKnew* at 624, 630. In *Strack*, the Fourth Circuit made clear that on the issue of whether a trust has been created for § 523(a)(4) purposes the bankruptcy court must look to state law "for guidance." *Strack* at 498. Virginia law is clear that officers and directors of corporations occupy a fiduciary relationship to the corporation and its stockholders. 4B M.J. Corporations § 195 (2007). Here, the court finds it unnecessary to decide this issue because Ferris's obligation is plainly excepted from discharge pursuant to § 523(a)(2)(A).

<u>Embezzlement and larceny</u>. A leading treatise lists the required elements of embezzlement as: "(1) appropriation of funds for the debtor's own benefit by fraudulent intent or deceit; (2) the deposit of the resulting funds in an account accessible only to the debtor; and (3) the disbursal or use of those funds without explanation of reason or purpose." 4 Collier on Bankruptcy ¶ 523.10 (Alan N. Resnick and Henry J. Sommer eds.,

12

16th ed. 2010). The court finds that the evidence is insufficient support a finding that Ferris's actions constituted embezzlement.

As to larceny, "[b]ankruptcy courts are not bound by state law definitions of larceny but may instead follow federal common law that defines larceny as the 'felonious taking of another's personal property with intent to convert it or deprive the owner of same.'" *Johnson v. Davis*, 262 B.R. at 672 (quoting *Clarendon Nat'l Ins. Co. v. Barrett (In re Barrett)*, 156 B.R. 529, 533 (Bankr. N.D. Tex. 1993)). The federal common law definition of larceny requires a wrongful taking and carrying away of the property. As with embezzlement, there is insufficient evidence before the court to support a finding of larceny.

As with the charge of "fraud or defalcation in a fiduciary capacity," the court finds it unnecessary to determine whether Ferris's actions constituted larceny or embezzlement, having already determined that the bulk of his debt to Crockett is nondischargeable pursuant to § 523(a)(2)(A).

## CONCLUSION

The court finds that the provisions of § 727(a)(2) and (a)(3) do not apply to bar Ferris's discharge in bankruptcy. The court further finds that $495,825.00, the debt owed Crockett from Ferris, is nondischargeable pursuant to § 523(a)(2)(A) of the Bankruptcy Code. A separate order will issue.

SIGNED:  March 31, 2011

/s/ Douglas O. Tice Jr.
DOUGLAS O. TICE JR.
CHIEF UNITED STATES BANKRUPTCY JUDGE

13

Copies to:

W. Davey Crockett
420 Libbie Avenue, 2nd Floor
Richmond, VA 23226
*Plaintiff*

Ernest C. Vaughan, Jr.
Randolph, Boyd, Cherry and Vaughan
14 East Main Street
Richmond, VA 23219
*Attorney for Plaintiff*

Shaheen Aloam Ferris, II
1520 Oak Grove Drive
Manakin Sabot, VA 23103
*Defendant/Debtor*

John Buckley Warden, IV
DurretteCrump PLC
1111 East Main Street, 16th Floor
Richmond, VA 23219
*Attorney for Defendant/Debtor*